IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 19-cv-01273-PAB-KLM
(Consolidated with Civil Action No. 19-cv-01694-PAB-KLM)

BRAYDON K., by and through his parents and next friends,
MARK K. and MICHELLE K.,

     Plaintiffs,

v.

DOUGLAS COUNTY SCHOOL DISTRICT RE-1,

     Defendant.

_____

DOUGLAS COUNTY SCHOOL DISTRICT RE-1,

     Plaintiff,

v.

B.K., a minor, by and through his parents and next friends,
MARK K. and MICHELLE K.,

     Defendants.

_____

**ORDER**
_____

This matter is before the Court on the Complaint [Docket No. 1][1] of the Douglas

County School District RE-1 ("the school district") and its Opening Brief [Docket No.

_____

[1] The school district's complaint was originally filed in case number 19-cv-01694-
PAB-KLM.

35].[2]  In its complaint, the school district requests that the Court reverse two decisions

of the State of Colorado, Office of Administrative Courts: (1) a decision that the school

district failed to provide a free appropriate public education ("FAPE") under the

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, to plaintiff

Braydon K; and (2) a decision that the school district did not provide Braydon's parents

with meaningful participation in developing his individualized educational program

("IEP").  Docket No. 1 at 12.[3]  In its appellate brief, the school district only raises

arguments concerning whether the school district provided a FAPE.  *See* Docket No.

35.  The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 20 U.S.C.

§ 1415(i)(3)(A).

## I.  FACTUAL BACKGROUND[4]

Braydon K. was born in 2004.  AR at 248.[5]  When Braydon was four years old,

he was found unattended on a city bus.  AR at 1075.  He was placed in foster care with

Michelle K. and Mark K ("Braydon's parents"), who eventually adopted him.  *Id.*  Before

being placed in the care of his parents, Braydon had experienced homelessness and

---

[2] All references to the docket will refer to case number 19-cv-01273-PAB-KLM unless otherwise noted.

[3] This citation references the docket in case number 19-cv-01694-PAB-KLM.

[4] In recounting these facts, the Court gives due weight to the factual findings of the administrative law judge ("ALJ"), which appear to be largely unchallenged by the parties.  *See L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004).

[5] The administrative record consists of one volume of conventionally filed materials.  Docket No. 31.  The record will be cited in this ordered as "AR" followed by the page number.

neglect.  AR at 1076.  Within the first few years of having custody, Braydon's parents

submitted him to a psychological evaluation.  AR at 1079.  Braydon was diagnosed with

attention deficit hyperactivity disorder ("ADHD"), post-traumatic stress disorder

("PTSD"), and dyspraxia (impaired motor condition).  AR at 1079-80.

From early on, Braydon had difficulty with boundaries and was defiant when

faced with authority.  AR at 1077-78.  In the fifth and sixth grades, Braydon's behavioral

issues escalated.  AR at 1078, 1080.  At home, he was stealing from his family and

from the grocery store, and he ran away from home more than once.  AR at 1078, 1086.

At school, he was insubordinate and disruptive to the point where teachers could not

instruct other students when he was present.  AR at 1083, 1085.  Due to these

behavioral issues, Braydon began attending school in a shortened school day.  AR at

1083-84.

For the 2016-17 school year, Braydon's parents enrolled him in a special

education program at the Front Range Christian School ("Front Range").  AR at 1088-

89.  He continued to engage in disruptive behaviors and was not permitted to return to

Front Range the following school year.  *Id.*  In the summer of 2017, Braydon's therapist,

Jennifer Platt, recommended that Braydon's parents meet with Rob Metzler, an

educational consultant.  AR at 1105-06.  Mr. Metzler recommended that Braydon

undergo a thirty-day evaluation at Northwest Passage, an assessment facility in

Frederic, Wisconsin.  AR at 1053-54.  At Northwest Passage, Braydon was examined

by a clinical psychologist, a child and family therapist, a psychiatric nurse practitioner,

and a developmental pediatrician.  AR at 1183.  A neuropsychological evaluation

3

placed Braydon's intellectual abilities in the low-average range.  AR at 274.

Emotionally, he showed signs of hyperactivity, somatization, attention problems, and

mild to moderate anxiety, depression, and aggression.  AR at 276.  Braydon was

diagnosed with disinhibited social engagement disorder, ADHD, and an anxiety

disorder that manifests in nervousness, worrying, fearfulness, and extreme emotional

sensitivity, as well as a developmental coordination disorder that prevents him from

staying on task and leads to severe difficulty tolerating emotional distress.  AR at 276-

77.  The evaluation indicated that Braydon "needs firm, consistent, and concrete

guidelines with immediate positive and negative consequences."  AR at 278.  The

evaluation recommended "a structured environment" for Braydon "that provides clear

expectations for his behavior."  *Id.*  Northwest Passage's Child and Family Assessment

recommended that "Braydon reside in an emotionally neutral environment that can be

firm, yet calm when providing redirections in a non-critical manner."  AR at 265.[6]

Northwest Passage further recommended "milieu therapy," which is structured,

consistent therapy "with integrated therapeutic interventions with [in-the-moment]

training opportunities." AR at 265.  It indicated that Braydon needed caregivers who

could provide consistent supervision and who could model healthy interpersonal

behaviors, such as boundary setting, effective communication, consistency, patience,

and support.  *Id.*  The assessment did not include any education-specific findings.  AR

at 262-66.  In the Northwest Passage psychiatric progress note, the nurse practitioner

---

[6] Braydon's mother believed that the family was not able to provide the emotionally neutral environment recommended by Northwest Passage.  AR at 1097.

opined that "Braydon requires a therapeutic residential program for ongoing mental health care." AR at 252.  The noted benefits of the residential program were that it would provide a higher level of medication management as well as constant supervision to determine the efficacy of the medications. *Id.* Further, the program would provide an environment where Braydon could identify and learn skills and then practice using them in his living environment. *Id.*

In Northwest Passage's assessment team summary, it was recommended that, "[a]t this time," Braydon "receive intensive services in a therapeutic residential program." *Id.* Mr. Metzler presented Braydon's parents with a list of schools that he believed might appropriately serve Braydon's needs. AR at 1100-01. One of the schools listed was the Wediko School in Windsor, New Hampshire ("Wediko"). *Id.* Wediko provides a highly structured environment that employs the recommended milieu approach in which every minute of the day has therapeutic value. AR at 1480.

Braydon's parents filled out an application for Braydon to attend Wediko. AR at 1118-19. The application process involved an interview with Braydon's parents and a half-day interview and meeting with Braydon. *Id.* Because Braydon's parents had not yet secured an alternative placement for Braydon, they re-enrolled Braydon in the school district effective August 8, 2017. AR at 218, 1103. They shared the Northwest Passage assessment with the school district for purposes of developing a new IEP. AR at 1105-07. In the meantime, on August 15, 2017, Wediko informed Braydon's parents that it had a spot available for Braydon. AR at 1103. Braydon started at the school on

August 21, 2017.  AR at 1454.[7]

Braydon had a difficult time adjusting to his placement at Wediko.  AR at 1415.

He was kicking, pushing, and elbowing other students and exposed himself to staff on

multiple occasions.  AR at 1415-16.  Mr. Russell Bloch, the senior clinical supervisor at

Wediko, testified at the hearing that this behavior led to Braydon being physically

restrained, on average, more than other students.  AR at 1421-22.  Each time that a

student needs to be physically restrained or engaged in "extreme behavior," Wediko

prepares a critical incident report ("CIR") documenting the event.  AR at 1421.  Mr.

Bloch testified that Braydon acquired approximately five times the number of CIRs than

is typical for other Wediko students, and that most of Braydon's CIRs resulted from

behavior outside of school hours.  AR at 1422.  Of thirty-one CIRs recorded between

August 22, 2017 and January 23, 2018, only one occurred during school hours.  AR at

164-67.[8]  From "the end of January 2018" until April 10, 2018, six additional CIRs were

recorded, five of which occurred outside of school hours.  AR at 197.

Wediko took several steps to support Braydon's educational progress.  Tobias

Iselin, the chief administrator of Wediko, testified that Braydon and a small number of

other students stay in a single classroom with a small number of other students, where

teachers come to teach them, as opposed to those students going from classroom to

---

[7] Braydon's parents currently pay costs associated with Braydon's education at
Wediko.  AR at 1062.

[8] The record indicates that thirty-five CIRs were recorded during this time period,
but includes information concerning the time of day at which the behavioral incident
occurred for only thirty-one of the thirty-five CIRs.  AR at 164.

6

classroom like other Wediko students.  AR at 1476-77.  Mr. Bloch indicated in his

testimony that "Braydon essentially requires constant adult attention," but that the

attention need not be one-on-one.  AR at 1429.

The evidence establishes that Braydon has experienced "measurable progress"

at Wediko since his enrollment.  AR at 1440.  Mr. Bloch testified that, compared to

when he started at Wediko, Braydon displays fewer extreme behaviors, has fewer

verbal outbursts, and has been able to maintain friendships with other students.  AR at

1413. Mr. Iselin testified that Wediko has "seen the intensity of [Braydon's] behaviors in

the classroom reduced" and has "seen him be able to respond better to teachers."  AR

at 1483.  Mr. Iselin explained that behavior that initially would have required Braydon to

leave the classroom may now just require a reset back to his desk area.  *Id.*  However,

Mr. Iselin testified that Braydon experiences a regression in these skills when he leaves

the classroom and, the longer that he is away from a structured environment, the more

behavioral issues resurface.  AR at 1484; *see also* AR at 1414 (Mr. Bloch testifying that

they "see regression after home visits").  Mr. Bloch stated in his testimony that he

believes Braydon requires a residential treatment program in order to "receive a basic

education, as well as to just be able to have some of the basic kind of enrichment

experiences that one would want for every kid."  AR at 1437-38.  Mr. Iselin testified that

he cannot "have a definitive answer" as to what environment Braydon requires as he

has only seen Braydon as a residential student.  AR at 1485-86.  He stated that

Braydon "definitely . . . needs a highly structured environment to access the current

curriculum."  AR 1486.  With regard to residential care, Mr. Iselin testified that Braydon

"paint[s] a picture of somebody who needs residential care," specifically in the context of "the behavior and social/emotional piece."  *Id.*[9]

While Braydon was enrolled at Wediko, Braydon's parents continued to work with the school district to develop a new IEP for Braydon to determine whether Braydon required additional services that were provided by Wediko, but which the school district could not provide.  On September 28, 2017, Braydon's parents signed a consent for evaluation of Braydon, which was given to them by the school district.  AR at 1104.  In addition, Braydon's parents gave the school district a release to discuss Braydon's situation with Wediko officials.  AR at 1107.  On November 15, 2017, the school district obtained Braydon's records from Front Range.  AR at 1619-20.  According to the ALJ, other than a Test of Written Language ("TOWL") that it administered to Braydon over the 2017 winter break, the school district relied entirely on testing done by Northwest Passage to determine Braydon's strengths and weaknesses for IEP purposes.  AR at 127.  A meeting was held on January 25, 2018 between Braydon's parents and school district officials to determine whether Braydon was eligible for support under the IDEA.  AR at 1111.  Braydon was determined to be eligible for an IEP.  AR at 174-180.  A meeting to develop Braydon's IEP was scheduled between Braydon's parents, the school district, and Wediko officials for February 16, 2018, but was postponed due to a school district employee's family emergency.  AR at 1767-77.

---

[9] Mr. Iselin further testified that, for example, in the residence, staff members can coach Braydon concerning inappropriate comments he may make, but "if Braydon was [making those comments] in the community or at a friend's house, parents would likely be calling and saying, [']We don't want our son or daughter to hang out with you.'" AR at 1486-87.

On February 9, 2018, the school district's liaison for out-of-district placements, Betsy Peffer, contacted a school called Shiloh House in Littleton, Colorado regarding Braydon.  AR at 620-21.  Shiloh House serves approximately thirty-five to forty students and provides treatment for children with needs similar to Braydon's.   AR at 1360-62.  Staff at Shiloh House are trained on principles of trauma-informed care, administering medication, deescalation, instructional delivery, and behavior management.  AR at 1367.  Shiloh House offers individual, group, family, and crisis-management therapy through master-level clinicians.  AR at 1369-72.  The ALJ found that Shiloh's services "substantially conform to the notion of 'milieu approach' discussed by Dr. [Robert] Law[10] and Mr. Bloch."  AR at 131.  Shiloh House indicated that it could accept Braydon into its day-treatment program.  AR at 1057.  This contact with Shiloh House occurred before an IEP team decision had been made.  AR at 1771-73.  School district officials did not inform Braydon's parents that they had been in contact with Shiloh House; when Shiloh House asked Ms. Peffer if it could reach out to Braydon's family, Ms. Peffer replied in the negative.  AR at 626.

The IEP meeting was held on April 10, 2018 between Braydon's parents, the school district, and Wediko officials.  AR at 652-660.  Before the meeting, Wediko provided the school district with a completed IEP draft, a functional behavioral assessment, and a behavior intervention plan that it had prepared for Braydon.  AR at 1435.  Braydon's mother testified that residential placement was not discussed by the

---

[10] Dr. Law is Northwest Passage's clinical psychologist and head of neuropsychological services.  AR at 120.

IEP team, although she informed the team that residential placement should be considered.  AR at 1116-17.  Ms. Donna Trujillo, the school district's special education director, testified that the IEP team considered keeping Braydon at Wediko, but that the team was concerned about the distance between the school and Braydon's family.  AR at 1778-79.  Ms. Trujillo, on behalf of the school district, offered a day treatment placement at Shiloh House at a third and final IEP meeting on April 16.  AR at 1777.  No other school was offered.  AR at 1116.  The IEP noted, however, that Shiloh House "has the option for residential placement should parents [choose] this."  AR at 209.

The ALJ found that Braydon's parents did not object to the majority of the IEP, *see* AR at 143,[11] and that Braydon's parents were primarily unhappy with the Shiloh House placement.  *Id.*  Braydon's parents performed online research into Shiloh House, but did not change their position that Braydon needed residential treatment.  AR at 1147.  Ultimately, the school district refused to change the IEP on the basis that "there was no information that Braydon requires residential treatment in order to access his education and receive [a] FAPE."  AR at 216, 1782.  The parents decided to keep Braydon enrolled at Wediko.  AR at 1597.

## II.  PROCEDURAL BACKGROUND

On July 19, 2018, Braydon's parents filed a due process complaint with the Colorado Department of Education, Office of Administrative Courts, alleging that the

_____

[11] Braydon's parents do not take issue with the content of the IEP as it relates to Braydon's current levels of performance, the impact of his disabilities, the statements of goals and measurable objectives, the accommodations and modifications, the finding of eligibility for extended school year services, or the statement of least restrictive environment.  AR at 134, 1141-43.

school district committed procedural and substantive violations of the IDEA in developing Braydon's IEP.  AR at 2-6.  Specifically, Braydon's parents alleged that the school district violated the IDEA by (1) not timely determining Braydon's IDEA eligibility and (2) not timely developing an IEP that was reasonably calculated to provide him a FAPE.  AR at 5.  The Office of Administrative Courts held a hearing from January 14 to January 17, 2019.  AR at 118.  The ALJ issued a decision on March 15, 2019.  AR at 138.  The ALJ concluded that, based on the testimony of Dr. Law, Ms. Bloch, and Ms. Tracy, the IEP was reasonably calculated to facilitate progress on Braydon's IEP goals. AR at 134.  The ALJ also found, however, that the parents had established that residential treatment was necessary to allow Braydon to receive a FAPE.  AR at 136. The ALJ found that Wediko fit this description and concluded that Braydon's parents were entitled to reimbursement for Braydon's placement beginning on April 10, 2018. AR at 136.  The ALJ also concluded that the school district did not unreasonably delay the completion of the IEP process, AR at 137, but that the school district committed a procedural violation of the IDEA when it "created an imbalance of information about the proposed placement" of Braydon at Shiloh House "that detrimentally impacted [the parents'] ability to participate as full-fledged IEP team members. AR at 137-38.  The ALJ determined, however, that no additional relief was warranted on this point.  *Id.* at 138.

On May 2, 2019, before the school district had filed its appeal, Braydon's parents filed – in the above captioned case, 19-cv-01273-PAB-KLM – a Complaint for Attorney Fees and Costs seeking an award of attorney's fees accrued during the ALJ

proceedings.  Docket No. 1 at 1.  The school district appealed the ALJ's decision on June 11, 2019 in what was originally assigned as case number 19-cv-01694-WJM-SKC.  Docket No. 1.  Braydon's parents answered the complaint and asserted one counterclaim alleging an additional error in the ALJ's decision.  Docket No. 9 at 7, ¶ 16.[12]  On June 17, 2019, Braydon's parents filed a motion for summary judgment on the attorney's fees issue in the above-captioned case.  Docket No. 10.  On July 22, 2019, the school district filed Defendant's Opposed Motion to Stay Proceedings [Docket No. 21] and Defendant's Unopposed Motion to Consolidate [Docket No. 20].  The school district requested that the above-captioned case, in which Braydon's parents seek attorney's fees, be stayed pending the resolution of the administrative appeal.  Docket No. 21 at 4.  In addition or in the alternative, the school district requested that case numbers 19-cv-01273-PAB-KLM and 19-cv-01694-WJM-SKC be consolidated.  Docket No. 20 at 4.  On July 29, 2019, the Court granted the motion to consolidate.  Docket No. 23 at 3.  The cases were consolidated and assigned to the Court under case number 19-cv-01273-PAB-KLM.  *Id.*

The school district filed its opening brief on November 8, 2019.  Docket No. 35. Braydon's parents responded on December 20, 2019, *see* Docket No. 38, to which the school district replied.  Docket No. 41.  On January 21, 2020, the parties filed a Joint Motion for Determination [Docket No. 42] seeking resolution of the administrative appeal.

---

[12] The preceding two citations reference the docket in case number 19-cv-01694-PAB-KLM.

## III.  LEGAL STANDARD

### A.  The Individuals With Disabilities Education Act

The IDEA conditions federal education funding on a state's compliance with certain requirements intended to ensure that states identify, evaluate, and serve children with disabilities.  *See* 20 U.S.C. §§ 1412, 1414, 1416.  One such requirement is that states establish policies and procedures to ensure that a FAPE is made available to every child between the ages of 3 and 21 who is determined to have a disability within the meaning of the IDEA.  20 U.S.C. § 1412(a)(1).  A FAPE is defined as

> special education and related services that –
>
> > (A) have been provided at public expense, under public supervision and direction, and without charge;
> >
> > (B) meet the standards of the State educational agency;
> >
> > (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> >
> > (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).  Thus, "[a] FAPE consists of both 'special education' and 'related services.'"  *Jefferson Cty. Sch. Dist. R-1 v. Elizabeth E.*, 798 F. Supp. 2d 1177, 1179 (D. Colo. 2011), *aff'd*, 702 F.3d 1227 (10th Cir. 2012) (citing 20 U.S.C. § 1401(9)).  "Special education" is defined as "specially designed instruction . . . to meet the unique needs of a child with a disability," while "related services" include "developmental, corrective, and other supporting services . . . as may be required to assist a child with a

13

disability to benefit from special education." 20 U.S.C. §§ 1401(29), 1401(26)(A). "A school district satisfies its obligation to provide a FAPE to a disabled child 'by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.'" *Elizabeth E.*, 798 F. Supp. 2d at 1180 (quoting *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 203 (1982)).

As indicated in § 1401(9)(D), the central mechanism for ensuring delivery of a FAPE in the least restrictive environment[13] is the individualized education program ("IEP"), a "written statement for each child with a disability" that identifies the child's present level of performance, the child's short- and long-term goals, objective criteria for measuring the child's progress, and the supplementary aids and services necessary to meet the child's educational needs. 20 U.S.C. § 1414(d)(1)(A)(i); *see also Honig v. Doe*, 484 U.S. 305, 311 (1988) (characterizing the IEP as the "centerpiece of the [IDEA's] education delivery system for disabled children"); *Murray ex rel. Murray v. Montrose Cty. Sch. Dist.*, 51 F.3d 921, 925 (10th Cir. 1995) ("The IEP is the basic mechanism through which th[e] goal of [providing a FAPE] is achieved for each

---

[13] The IDEA also requires that children with disabilities receive a FAPE in the least restrictive environment ("LRE"). The LRE mandate provides that,

> [t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, [shall be] educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment [may occur] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5); *see also* 34 C.F.R. § 300.114(a).

disabled child."). Thus, the determination of whether a child has been provided a FAPE in the least restrictive environment turns in large part on the sufficiency of the child's IEP. *See, e.g.*, *A.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 675 (4th Cir. 2007) ("A school provides a FAPE by creating an [IEP] for each child."). The IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017).

Finally, if a disabled child's parents believe that the school district failed to provide a FAPE, 20 U.S.C. § 1412(a)(10)(C)(ii) provides that

> [i]f the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

However, "parents who unilaterally change their child's placement . . . without the consent of state or local school officials[] do so at their own financial risk. If the courts ultimately determine that the IEP proposed by the school officials was appropriate, the parents would be barred from obtaining reimbursement." *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 373-74 (1985).

### B.  Standard of Review

In reviewing the ALJ decision, the Court "shall receive the records of the administrative proceedings;" "shall hear additional evidence at the request of a party;"

and, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The Court reviews legal challenges *de novo*, without deference. *See O'Toole ex rel. O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 699 (10th Cir. 1998). However, "though the statute specifies that review is *de novo*, the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean that 'due weight' must be given to the administrative proceedings, the fact findings of which are considered prima facie correct." *Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1150 (10th Cir. 2008) (citation and quotation marks omitted).

## IV.  ANALYSIS

### A.  Whether the School District Provided a FAPE

The school district argues that "the ALJ expressly found that the day treatment setting at Shiloh House was reasonably calculated to implement Braydon's IEP goals and objectives" and that this finding "should have ended the inquiry." Docket No. 35 at 22. It argues that the ALJ's decision that residential placement was necessary for Braydon to receive a FAPE is incorrect because "the task of finding resources to address [Braydon's] off-campus behaviors falls to his parents," and that, generally, the residential services at issue here are in place to serve Braydon's general welfare, rather than his educational needs. *Id.* at 22-23. Braydon's parents, however, argue that the IEP is insufficient to provide a FAPE because it does not include a residential placement, which they contend is necessary for Braydon to receive an educational benefit. Docket No. 38 at 21.

In his decision, the ALJ found that Shiloh House "was shown to offer the milieu treatment approach that was established to be appropriate" for Braydon.  AR at 134. The ALJ determined that, "[w]hether at Shiloh House or Wediko, [Braydon] would be educated in a highly structured setting where appropriate behavior interventions and mental health supports . . . would be implemented to facilitate progress on the Student's academic and social/emotional goals." *Id.*  However, the ALJ concluded that this was nevertheless insufficient to enable Braydon to receive an educational benefit because "the environment in the Student's home was not appropriate as of April, 2018, to permit progress realized during the day to be retained and generalized to a reasonable degree."  AR at 136.  Specifically, the ALJ noted that Braydon's mother "expressed serious concern that [the parents] would be unable to implement [structured behavioral modification strategies] at home as [Braydon] had triggered family responses that were not 'emotionally neutral,'" and that Braydon's mother feared that, if Braydon's home life could not "reinforce the behavior modification strategies in place at school, . . . [Braydon] would regress, potentially leading to his failure on his IEP goals, inadequate social/emotional development, elopement, and even criminal conduct."  AR at 135.  The ALJ also relied upon the deposition testimony of Dr. Law, who "expressed reservations about whether the [parents'] home environment was adequate to enable a day treatment model to be successful for the Student." *Id.*[14]  The ALJ concluded that Braydon's parents had met their burden of demonstrating that residential placement,

---

[14] As the ALJ noted, Dr. Law "did not opine that residential placement was the only way to implement a therapeutic lifestyle" for Braydon.  AR at 135.

offered as a related service under 20 U.S.C. § 1401(26)(A), was necessary for Braydon

to receive a FAPE.  *Id.*  Braydon's parents argue that this was the correct decision

because residential placement is necessary to address Braydon's educational needs

and thus, must be included in his IEP to provide him a FAPE.  Docket No. 38 at 21.

The school district agrees that the issue in this case is whether the ALJ properly

classified residential placement as "related services" under the IDEA.  Docket No. 35 at

20-21.

> The IDEA includes an extensive definition of "related services," including:

> transportation, and such developmental, corrective, and other supportive
> services (including speech-language pathology and audiology services,
> interpreting services, psychological services, physical and occupational
> therapy, recreation, including therapeutic recreation, social work services,
> school nurse services designed to enable a child with a disability to
> receive a free appropriate public education as described in the
> individualized education program of the child, counseling services,
> including rehabilitation counseling, orientation and mobility services, and
> medical services, except that such medical services shall be for
> diagnostic and evaluation purposes only) as may be required to assist a
> child with a disability to benefit from special education, and includes the
> early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(26)(A).  A number of circuit courts have created tests to determine

whether a residential service constitutes a "related service" under the IDEA.  For

example, the Third Circuit looks at "whether full-time placement may be considered

necessary for educational purposes, or whether the residential placement is a response

to medical, social or emotional problems that are segregable from the learning

process."  *Kruelle v. New Castle Cty. Sch. Dist.*, 642 F.2d 687, 693 (3d Cir. 1981).  The

Fifth Circuit has set forth the following test: "In order for a residential placement to be

appropriate under IDEA, the placement must be 1) essential in order for the disabled child to receive a meaningful educational benefit, and 2) primarily oriented toward enabling the child to obtain an education." *Richardson Indep. Sch. Dist. v. Michael Z*, 580 F.3d 286, 299 (5th Cir. 2009).  "[I]f a child is able to receive an educational benefit without the residential placement, even if the placement is helpful to a child's education, the school is not required to pay for it under IDEA." *Id.* at 300.  Meanwhile, the Seventh Circuit analyzes whether the services are "primarily oriented toward enabling a child to obtain an education" or are rather "services oriented more toward enabling the child to engage in noneducational activities." *Dale M. ex rel. Alice M. v. Bd. of Ed.*, 237 F.3d 813, 817 (7th Cir. 2001).  According to the Seventh Circuit, "[t]he former are 'related services' within the meaning of the statute, the latter not." *Id.*

The Tenth Circuit has not ruled precisely on how courts should determine whether residential placement constitutes a "related service" for purposes of deciding whether a school district provided a FAPE.  *See Elizabeth E.*, 702 F.3d at 1235 ("[I]t is unnecessary to endorse [any] approach because [the residential placement] is reimbursable under a straightforward application of the statutory text.").[15]  In *Elizabeth E.*, the Tenth Circuit stated that, in determining whether residential placement is reimbursable under the IDEA, courts should, *inter alia*, "determine whether such

---

[15] In *Elizabeth E.*, the Tenth Circuit specified that it was not fashioning a new test for purposes of determining whether a service is a "related service" under the IDEA, but rather was applying the plain meaning of the statute.  702 F.3d at 1237 n.5.

additional services can be characterized as 'related services' under the Act."[16]  *Id.* at

1237.  The Tenth Circuit has, however, critiqued the approaches found in the Third,

Fifth, and Seventh Circuits.  *See id.* at 1237-38 (stating that "determining whether a

child's needs are 'segregable' (as the Third Circuit defines the term), while potentially

helpful in some instances, is not central to a reviewing court's task in every case" and

"it is not at all clear that determining whether a placement is 'primarily oriented toward

enabling a child to obtain an education' sheds any light on the question of whether . . .

additional services provided by a placement are required to assist the child to benefit

from such instruction.").  According to the Tenth Circuit, IDEA reimbursement claims

are highly fact-specific, and questions concerning related services center on whether

the services are *required* for a particular child to obtain an educational benefit.  *Id.* at

1238.

 While the appropriate test in the Tenth Circuit to determine whether services

constitute "related services" under the IDEA is unclear, the parties agree that, to qualify

as a "related service" under the IDEA, residential placement must be *necessary* to

ensure that the student can receive an educational benefit.  *See* Docket No. 35 at 25;

Docket No. 38 at 2, 21.  Federal courts uniformly agree.  *See Irving Indep. Sch. Dist. v.*

---

[16] Specifically, the Tenth Circuit stated that courts should (1) determine whether the school district provided a FAPE, and if not, (2) determine whether the private placement is accredited, and if so, (3) determine whether the private placement provides a special education, and if so, (4) determine whether any additional services can constitute "related services" under the IDEA. *Elizabeth E.*, 702 F.3d at 1236-37. This approach is not applicable to this case, as the Court must determine not simply whether the residential services are reimbursable under the IDEA, but whether the school district failed to provide Braydon a FAPE by failing to provide him with an IEP that included residential services as "related services."

*Tatro*, 468 U.S. 883, 894 (1984) (stating that school districts must provide only "services *necessary* to aid a . . . child to benefit from special education") (emphasis added); *Ashland Sch. Dist. v. Parents of Student R.J.*, 588 F.3d 1004, 1009 (9th Cir. 2009) (reimbursement for private, residential placement is appropriate only if it is "*necessary* to provide special education and related services." (citation and quotation omitted) (emphasis added)); *Clovis Unified Sch. Dist. v. Calif. Office of Admin. Hearings*, 903 F.2d 635, 643 (9th Cir. 1990) (finding that "mere 'supportiveness' [of a student's education] is too broad a criterion to be the test for whether a specific service is necessary under the Act to assist a child to benefit from special education").  The Third, Fifth, and Seventh Circuit tests similarly require that the related services be necessary for the student to receive an educational benefit.  *See, e.g., Michael Z.*, 580 F.3d at 300 ("[I]f a child is able to receive an educational benefit without the residential placement . . . the school is not required to pay for it under IDEA.").

In *Elizabeth E.*, then-Judge Gorsuch wrote a concurring opinion cautioning of the unintended consequences that may flow from an overbroad definition of "related services," similarly focusing on whether the service in question is necessary for a student to receive an educational benefit: "a private placement under IDEA is permissible *only* if it is necessary to supply the child with a meaningful *educational* benefit the public school has proven unable or unwilling to supply – not to address purely social, emotional, or medical needs."  702 F.3d at 1244 (emphasis in original). "This conclusion unsurprisingly aligns with Congress's stated purpose in enacting IDEA: its wish to ensure public schools address the '*educational* needs' of 'children with

disabilities,' not to force public schools to displace all other social service agencies and become the providers of first resort of all medical, emotional, and social care and instruction." *Id.* (emphasis in original) (quoting 20 U.S.C. § 1400(c)(2)).

The Court finds the concurrence instructive.  The purpose of the IDEA is to "ensure that all children with disabilities have available to them a free appropriate public education."  20 U.S.C. § 1400(d)(1)(A).  To do so, a school district must provide the student with special education and related services that are *required* to meet the student's educational needs.  20 U.S.C. § 1401(9).  However, a school district need not provide services that will simply assist or enhance the student's educational experience.  *Compare O'Toole By & Through O'Toole v. Olathe Dist. Sch. Unified Sch. Dist. No. 233*, 144 F.3d 692, 708 (10th Cir. 1998) ("[T]he 'appropriate' education required by the Act is not one which is guaranteed to maximize the child's potential.") (quotation omitted); *see also Thompson*, 540 F.3d at 1155 ("The Act does not require that States do whatever is necessary to ensure that all students achieve a particular standardized level of ability and knowledge.  Rather, it much more modestly calls for the creation of individualized programs reasonably calculated to enable the student to make some progress towards the goals within that program.").  As explained in the *Elizabeth E.* concurrence, a school district is not required under the IDEA to undertake social service responsibilities that are not necessitated by the student's educational needs.  Thus, to determine whether the residential services here constitute "related services" under the IDEA, the Court finds it appropriate to focus on whether these residential services are *necessary* for Braydon to receive an educational benefit.

Courts must be careful in determining whether an educational service is necessary to permit a student to receive an educational benefit rather than simply assistive in the student's education. "[N]ot all services that can be broadly construed as educational are cognizable under IDEA." *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 244 (3d Cir. 2009). "[U]ltimately[,] any life support system or medical aid can be construed as related to a child's ability to learn." *Id.* Accordingly, the Court "must 'assess the link between the supportive service or educational placement and the *child's learning needs*.'" *Id.* (quoting *Kruelle*, 642 F.3d at 694) (emphasis added). Services that merely tangentially support a child's education are not eligible for reimbursement. *See Clovis*, 903 F.2d at 643.

The Court finds that, based on the undisputed facts as established by the ALJ, the ALJ erred in finding that the residential placement at Wediko was a "related service" under the IDEA. First, the Court finds that the ALJ's decision is contradictory. The ALJ found that the IEP provided by the school district involving the day program at Shiloh House would provide the recommended highly structured environment and milieu therapy approach, AR at 134, and that the IEP was "reasonably calculated to enable implementation of the IEP goals and accommodations," AR at 136 – goals and accommodations which the parents do not contest. AR at 1141-43. A finding that an IEP is reasonably calculated to enable a student to meet his or her IEP goals is tantamount to a finding that the school district met its obligations under the IDEA. *See Endrew F.*, 137 S. Ct. at 999 ("To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress

23

appropriate in light of the child's circumstances."). If the IEP was reasonably calculated to ensure that Braydon receives an education, then residential placement is necessarily not a "required service" under the IDEA; the ALJ's analysis should have stopped there. *See Elizabeth E.*, 702 F.3d at 1236 (stating that a hearing officer must "[d]etermine whether the school district provided or made a FAPE available to the disabled child in a timely manner" and "if it did, the unilateral parental placement is not reimbursable."). The ALJ, however, continued on in his analysis, concluding that, because "the environment in the student's home was not appropriate as of April, 2018, to permit progress realized during the day to be retained and generalized to a reasonable degree," Braydon's parents had "met their burden of demonstrating the necessity of residential treatment as a related service to allow the Student to receive a FAPE." AR at 136.

The Court finds that, based on the undisputed facts, the ALJ erred in finding that the residential placement was a necessary "related service" under the IDEA because the undisputed facts do not demonstrate that residential placement is *necessary* for Braydon to receive an educational benefit. The Court is persuaded by the analysis in *Clovis*, 903 F.2d 635. In *Clovis*, the parties agreed that some sort of residential placement was necessary for the student to receive an educational benefit, but disputed whether a psychiatric hospitalization was necessary or whether a less restrictive environment was sufficient. *Id.* at 641-42. The student's parents argued that the psychiatric hospitalization was necessary for the student to receive any educational benefit. *Id.* at 642. The court looked to whether "placement may be considered

necessary for educational purposes, or whether the placement is a response to medical, social, or emotional problems that is *necessary quite apart from the learning process*." *Id.* at 643 (emphasis added).  The court explained the difference between services which are *necessary* for a child to receive an education versus services which merely *support* a child's education:

> If a child requires, for example, ear surgery to improve his hearing, he may learn better after a successful operation and therefore in some respects his surgery is "supportive" of his education, but the school district is certainly not responsible for his treatment.  Similarly, a child who must be maintained on kidney dialysis certainly cannot physically benefit from education to the extent that such services are necessary to keep him alive, but again, it is not the responsibility of the school district to provide such maintenance care.

*Id.*  "[M]ere 'supportiveness' is too broad a criterion to be the test for whether a specific service is necessary under the Act to assist a child to benefit from special education." *Id.*

The Court finds that this case is analogous to the hypothesized cases of a hearing-impaired student or kidney-dialysis patient in *Clovis*: while certain services may assist a student's education, this is insufficient to demonstrate that those services are *necessary* for the child to receive an education and demonstrate that the school district is required to provide those services to the family.  This is in contrast to those cases in which a service not provided by the school district was deemed necessary for the student to receive any educational benefit.  *See, e.g., River Forest Sch. Dist. No. 90 v. Ill. State Bd. of Educ.*, 1996 WL 189279, at *1, *14 (N.D. Ill. Apr. 17, 1996) (finding that rehabilitation services that helped "barely communicative" student's severe

communication disabilities were "necessary to assist [the student] to benefit from any type of education"); *Tatro*, 468 U.S. at 892 (concluding that catheterization services during school were necessary to provide student with spina bifida with an education because services allowed her to remain at school during the day).  In these cases, without the additional service provided by a non-school-district entity, it would have been essentially impossible for the student to receive any sort of education because the students would have been unable to participate in educaton.

In contrast, the facts found by the ALJ in this case do not establish this threat of being unable to make progress in school.  The ALJ found that, "[w]hether at Shiloh House or Wediko, [Braydon] would be educated in a highly structured setting where appropriate behavior interventions and mental health supports (including individual and group therapies) would be implemented to facilitate progress on the Student's academic and social/emotional goals."  AR at 134.  The IDEA "does not authorize residential care merely to enhance an otherwise sufficient day program."  *Burke Cty. Bd. of Educ. v. Denton*, 895 F.2d 973, 980 (4th Cir. 1990) (quotation and emphasis omitted).  "Only '[i]f the educational benefits which can be provided through residential care are essential for the child to may any educational progress at all [is] residential care . . . required under the [IDEA].'"  *Y.B. v. Bd. of Educ. of Prince George's Cty.*, 895 F. Supp. 2d 689, 706 (D. Md. 2012) (quoting *Denton*, 895 F.2d at 980) (alteration marks and emphasis in original)).  The facts here do not demonstrate the necessity of residential placement for Braydon's *educational* progress.  Northwest Passage was the first entity to recommend residential placement for Braydon, but it did so for the

purpose of aiding Braydon's "ongoing mental health care" and so that Braydon could experience a higher level of medication management and learn behavioral skills.  AR at 252.  Thus, this recommendation does not demonstrate that residential placement is necessary for Braydon's educational advancement.  *See Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 433-34 (3d Cir. 2013) (parents not entitled to reimbursement when student was placed at residential facility for mental health, rather than educational, needs).  And, although Mr. Iselin testified that Braydon may need residential placement, his conclusion was expressly based on Braydon's non-educational needs. *See* AR at 1486 (testifying that he believes that Braydon needs residential placement to form friendships, have meaningful relationships with others, and work on his social pragmatics).

While the ALJ noted concern that Braydon would regress in his behavioral issues outside of school, which may impact him educationally, such concern does not establish that residential placement is necessary for Braydon to receive an educational benefit.  *See O'Toole*, 144 F.3d at 708 ("[A]n IEP is not inadequate simply because parents show that a child makes better progress in a different program.") (quotation omitted).  Of Braydon's thirty-seven CIRs in the record, only two occurred during school hours.  AR at 164-67, 197.  This indicates that Braydon's behavioral issues are mitigated by a highly structured, milieu-based school setting – which the ALJ found would be present at Shiloh House, the placement provided in the IEP – such that he is able to participate in the educational process while in this school setting.  While Braydon's behavioral problems outside of school hours may necessitate additional

intervention, such intervention would be "necessary quite apart from the learning process." *Clovis*, 903 F.2d 643; *see also Ashland Sch. Dist. v. Parents of Student R.J.*, 585 F. Supp. 2d 1208, 1231 (D. Or. 2008), *aff'd*, 588 F.3d 1004 (9th Cir. 2009) (finding that residential placement was not necessary to meet student's educational needs where behavioral issues "manifested themselves away from school grounds").

The Court finds that the undisputed facts fail to demonstrate that residential placement is necessary for Braydon to receive an educational benefit so as to render it a "required service" under the IDEA. The ALJ found that Braydon's IEP was sufficient for him to receive an education and progress in his educational goals. The ALJ's inquiry should have ended there. As a result, the ALJ erred in finding that the school district had failed to provide a FAPE by refusing to offer residential placement in Braydon's IEP. For these reasons, the ALJ's decision regarding the substantive violation of the IDEA will be reversed.[17]

### B.  Procedural Violation of the IDEA

The ALJ found that, in addition to its purported substantive violation of the IDEA, the school district also committed a procedural violation of the IDEA. Specifically, the

---

[17] On February 6, 2020, Braydon's parents filed a notice of supplemental authority [Docket No. 43] alerting the Court to the recently decided case of *Colonial School District v. E.G.*, 2020 WL 529906 (E.D. Pa. Jan. 31, 2020). The Court finds that this case, in which the court affirmed a hearing officer's decision that a school district had failed to provide a student a FAPE, is not applicable here. In *E.G.*, the school district challenged the hearing officer's conclusions that the school district officials' testimony was not credible. 2020 WL 529906, at *4. The *E.G.* court found that the school district had failed to demonstrate error in the hearing officer's credibility determinations. *Id.* at *6. This case does not provide any guidance as to the issues in this case, namely, whether residential placement was necessary for Braydon's educational purposes, and therefore does not change the Court's decision.

ALJ concluded that the school district had violated 34 C.F.R. 300.513(a)(2)(ii)[18] by

creating an imbalance of information about the proposed placement at Shiloh House

that detrimentally impacted Braydon's parents' ability to meaningfully participate as IEP

team members.  AR at 137-38.

Title 34 C.F.R. § 300.513(a)(1) provides that, "[s]ubject to paragraph (a)(2) of

this section, a hearing officer's determination of whether a child received FAPE must be

based on substantive grounds."  Paragraph (a)(2) further provides that "[i]n matters

alleging a procedural violation, a hearing officer may find that a child did not receive a

FAPE only if the procedural inadequacies . . . [s]ignificantly impeded the parent's

opportunity to participate in the decision-making process regarding the provision of a

FAPE to the parent's child."  34 C.F.R. § 300.513(a)(2)(ii).

The school district did not make an argument regarding the ALJ's finding of a

procedural violation in its opening brief.  *See* Docket No. 35.  Instead, it states in a

footnote that, "[b]ecause resolution of the substantive question moots the procedural

claims, the District's opening brief will not address the procedural claims."  *Id.* at 3 n.1.

The parents argue that, because the school district failed to present an argument on

this issue, the school district waived its ability to contest the ALJ's procedural finding.

Docket No. 38 at 2.[19]  In its reply brief, the school district counters that, "even in cases

_____

[18] The ALJ found a violation of 34 C.F.R. § 300.513(a)(1)(ii), but the Court
believes that the ALJ intended to find a violation of 34 C.F.R. § 300.513(a)(2)(ii).

[19] The parents classify the ALJ's conclusion that the school district precluded
them from meaningful participation in the IEP process as a finding that the school
district had committed "a substantive violation" of the IDEA.  *See* Docket No. 38 at 2.
This is incorrect.  Not only did the ALJ repeatedly describe this violation as a

29

raising procedural claims, a court still must base its decision on substantive grounds," citing 20 U.S.C. § 1415(f)(3)(E),[20] and again asserts that, "[b]ecause resolution of the substantive question moots the procedural claims," it did not waive any claims.  Docket No. 41 at 11.  It then presents a brief argument challenging the ALJ's procedural finding.  *Id.* at 12.

The school district cites no authority and provides no argument concerning why the resolution of the substantive claims "moots" the procedural violations.  Both 20 U.S.C. § 1415 and 34 C.F.R. § 1415 provide that a hearing officer may find a violation of the IDEA on procedural grounds if the procedural irregularities prevent the parents from meaningful participation in the decisionmaking process – a finding which the ALJ made.  AR at 137-38.  The school district's failure to challenge the ALJ's procedural finding[21] waives any argument on appeal, and the Court will affirm the ALJ's finding of a

---

"procedural violation," *see* AR at 138, but the regulation specifically provides that a finding that the school district impeded the parents' opportunity to participate in the FAPE decision-making process is a procedural violation of the IDEA.  *See* 34 C.F.R. § 300.513(a)(2)(ii).

[20] Title 20 U.S.C. § 1415(f)(3)(E) provides that, "[s]ubject to clause (ii), a decision made by a hearing officer shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education."  20 U.S.C. § 1415(f)(3)(E)(i).  Clause (ii) is identical to 34 C.F.R. § 300.513(a)(2)(ii), providing that a hearing officer may find that a child did not receive a FAPE if the procedural inadequacies significantly impeded the parents' opportunity to participate in the FAPE decisionmaking process.  20 U.S.C. § 1415(f)(3)(E)(ii).

[21] In its complaint, the school district prayed for a judgment declaring that it had provided Braydon's parents with a meaningful participation in the development of Braydon's IEP.  Docket No. 1 at 12 (Case No. 19-cv-01694-PAB-KLM).  The Court finds that this is insufficient to avoid waiver of this argument.  *See Williams v. Steward*, 488 F. App'x 322, 323 n.1 (10th Cir. 2012) (unpublished) ("Although the notice of appeal names several procedural orders, Williams does not address them in his opening brief.

procedural violation.

Given the ALJ's finding that a substantive violation had occurred and his subsequent determination that the parents were entitled to reimbursement for Braydon's placement at Wediko, he "conclude[d] that no separate or additional relief is warranted on th[e] procedural violation." AR at 138. Because the Court has reversed the ALJ's determination that the school district failed to provide a FAPE, the ALJ's award of reimbursement will also be reversed. *See Erickson v. Albuquerque Pub. Schs.*, 199 F.3d 1116, 1122-23 (10th Cir. 1999) (while a procedural violation may result in court-ordered relief, "compensatory education is not an appropriate remedy for a procedural violation of the IDEA."). The question concerning what relief, if any, Braydon's parents are entitled to in this context – where a procedural violation has been found, but the school district provided a FAPE[22] – was not addressed by the ALJ and has not been briefed by the parties. As a result, the Court will remand this case to the ALJ for a determination concerning what, if any, relief Braydon's parents are entitled to. The ALJ may order additional briefing if necessary.[23]

_____

Thus, we deem any appeal from those rulings waived and do not address them."). Similarly, the school district's argument [Docket No. 41 at 11] that it did not waive any arguments because it had indicated that its "*opening brief* will not address the procedural claims," Docket No. 35 at 3 (emphasis in original), is meritless. "[A] party waives issues and arguments raised for the first time in a reply brief." *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) (quotation omitted). Thus, the Court will not address the school district's argument in its reply brief that the parents meaningfully participated in the development of Braydon's IEP. *See* Docket No. 41 at 12.

[22] Finding a procedural violation of the IDEA does not preclude a finding that the school district provided a FAPE. *Erickson*, 199 F.3d 1120 n.4.

[23] Given the Court's finding that Braydon's parents are not entitled to reimbursement, the Court does not reach the parents' argument that the ALJ erred in determining the date on which the parents were first entitled to reimbursement. *See*

## IV.  CONCLUSION

For these reasons, it is

**ORDERED** that the Joint Motion for Determination [Docket No. 42] is

**GRANTED**.  It is further

**ORDERED** that the decision of the ALJ is **AFFIRMED IN PART** and **REVERSED**

**IN PART**.  It is reversed to the extent that it finds that the school district committed a

substantive violation of the IDEA.  It is affirmed to the extent that it finds that the school

district committed a procedural violation of the IDEA.  It is further

**ORDERED** that this case is **REMANDED** to the ALJ to determine whether

Braydon's parents are entitled to relief based on the school district's procedural

violation of the IDEA.  It is further

**ORDERED** that the Motion for Summary Judgment [Docket No. 10] is **DENIED**

**AS MOOT**.  It is further

**ORDERED** that Defendant's Opposed Motion to Stay Proceedings [Docket No.

21] is **DENIED AS MOOT**.

DATED May 29, 2020.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

---

Docket No. 38 at 15.